## Ætna Life Insurance Company v. Mary S. Sanford.

1.  LIFE INSURANCE—*Waiver of a Forfeiture for a Failure to Pay Premiums.*—It is within the power of a life insurance company to waive a condition of its policy providing that if a premium is not paid when due, the policy shall cease and determine, and such waiver may be effected by its course of business with the holder of the policy.

2.  SAME—*No Power to Insist upon Further Action by the Insured After it Has Once Granted Him an Extension.*—After a life insurance company grants an extension of sixty days to a policy holder in which to pay his annual premium, it is powerless to demand a statement from him a month later, that he is still in good health, as a condition to permitting the policy to remain in force during the sixty days.

Assumpsit, on a policy of life insurance.  Appeal from the Circuit Court of Grundy County; the Hon. HARVEY M. TRIMBLE, Judge, presiding.  Heard in this court at the April term, 1901.  Affirmed.  Opinion filed October 8, 1901.

**Statement.**—Edward Sanford, an attorney residing at Morris, Illinois, held several policies of insurance upon his life in the Ætna Life Insurance Company, two of which are involved in this case.  One of these was No. 26071, dated March 7, 1876, for $5,000, payable to his wife, Mary S. Sanford, the annual premium upon which was $132.10, payable February 10th of each year during the continuance of the policy.  It contained provisions that if any premium

should not be paid when due the policy should cease and determine, and the company should not be liable to pay the sum insured therein or any part thereof, but that if all premiums had been paid for three years or more, and any subsequent premiums became due and were not paid, a paid-up non-participating policy would be issued in accordance with a table on the back of the policy if the policy in question was returned to the company and a paid-up policy applied for within twelve months from the time of such default in premium. The other was No. 113514, a paid-up policy for $500, also payable to Mrs. Sanford, upon which was indorsed an agreement that the surplus arising under said policy should be applied in reduction of premiums on policy No. 26071. Sanford paid all premiums on policy No. 26071 to and including February 10, 1899, a period of twenty-three years. In December, 1899, he went on a trip to Mexico with his wife, leaving his son Frank in charge of his office. Sanford returned from Mexico on February 27, 1900, was taken ill March 8th, and died March 18th. Proofs of death were duly furnished the company under said policy No. 26071. The company refused to pay, and Mrs. Sanford brought this suit to recover the face of that policy. To an appropriate declaration the company pleaded the general issue. The defense in fact interposed at the trial was that the policy had lapsed for non-payment of the premium due February 10, 1900, and the reply set up by the plaintiff was that the company had by its conduct waived the forfeiture and had extended the time of payment sixty days, and that payment was tendered it within that time and during Sanford's life. During the trial defendant admitted $2,680 was due under this policy as its surrender value, and tendered plaintiff that sum and also $20 for costs of court, and the tender being refused, deposited $2,700 with the clerk of the court. Plaintiff recovered a verdict for $4,924.32, and had judgment thereon, from which defendant appeals.

On January 31, 1900, Frank Sanford received through the mail a notice from the managers and agents of the

insurance company at Chicago, addressed to his father, informing him that the premium on said policy would be due on February 10, 1900; that the dividend on No. 113415 was $3.62, and deducting that, the balance of the premium on No. 26071 would be $128.48, and requesting payment on or before the day the premium fell due. On February 5, 1900, Frank replied to said managers as follows:

" Yours received, saying that Mr. Sanford's insurance is due on the 10th of this month. He is in Mexico and will not return till the first of March and has left no orders with me for the payment of the same, or in fact said nothing about it. Will you please inform me just what the amount is that will be due and if it will be necessary for it to be paid on that date or if it can wait until he returns and then be paid. Please let me know just what your rules are in regard to this and oblige. ° You see it would be impossible for me to get any word to him and an answer back by this date."

To this Ira J. Mason & Son, said managers, replied as follows on February 8th:

" We inclose herewith a note for an extension of sixty on the premium under policies Nos. 113514 and 26071—E. Sanford. We suggest that you sign these notes for E. Sanford and in the meantime you can communicate with him and learn what his wishes are."

With this was inclosed an unsigned note for $128.48 premium and $1.28 interest, total $129.76, payable on or before April 10, 1900, to Ira J. Mason & Son, as agents of the insurance company, which recited it was given to extend the time of payment of renewal premium on policy No. 26071, and that if not paid when due there would be no further extension, and said policy should then cease and determine, and should be treated as if this conditional note and extension had not been given. This note was called by the insurance company " Form No. 71."

Frank Sanford received this letter February 9th. He testified that he at once sent Ira J. Mason & Son a postal acknowledging receipt of the letter and note, thanking them for the communication and saying it would be attended to immediately. Frank was in doubt whether it was

intended that he should sign his father's name or his own to the renewal note, and whether it was proper he should sign his father's name. He had an older brother, Edward H. Sanford, who was in business in Chicago, and who would be home the evening of the next day, Saturday. He determined to consult him on the subject, and waited his arrival. Edward H. arrived at night of the 10th, and they had an interview that evening in their father's office, as a result of which Frank signed his father's name and his own name to the note, put a revenue stamp on it, and cânceled the stamp. Edward H. made a copy of the note, which was preserved among his father's papers. Frank then wrote the following letter to the company :

"Herewith enclosed please find note properly stamped, for $129.76 due on or before April 10, 1900, payable to the order of Ira J. Mason & Son, your agent, which I have signed for my father, E. Sanford, and also myself, according to directions in your favor of February 8th, receipt of which I have acknowledged previously, given to extend payment of premium under policy 26071."

Frank then enclosed the note and letter in one of Mason's printed return envelopes, bearing the address of the insurance company's agents in Chicago, put on it a postage stamp, and, the post-office in Morris being then closed for the night, handed the letter to his brother, Edward H., to mail. The latter testified he carried it to Chicago on his return to that city on Monday morning, February 12th, and deposited it in a mail box in the Rock Island depot in Chicago immediately upon his arrival there. Ira J. Mason & Son then had an office containing seven rooms, in which eight persons were engaged. The son, Fred Mason, testi-. fied no one but himself and his father had any authority to open mail; that no one else ever did in fact do so, and that they were both in the city from February 10th to 15th. He and his father each testified they never received the note, and that the course of business in their office was such that they must have seen it if it had been returned to the office. Either Saturday or Monday, February 10th or 12th, Frank wrote his father what he had done, and on his

father's return told him about it. In the evening of March 8th, Edward Sanford was taken quite ill with a bad cold, which finally developed into pneumonia, of which he died. On March 10th, Sanford, being then confined to the house but not seriously ill, dictated to another son, William G., the following letter to Mason:

"Upon my return from Mexico, I find your letter stating that the premium on my policy No. 26071 was due on February 10, 1900, but you kindly extended the payment thereof sixty days. Please accept my thanks for the courtesy and I herewith enclose you Chicago draft for $130, not knowing just what the exact premium will be, and supposing that there will be some interest added thereto. If this is not enough, please inform me immediately and I will remit; if too much, you may credit the balance on the policy or return, as you see fit."

This letter Sanford signed, and enclosed in it his check for $130, drawn on the Illinois Trust & Savings Bank, Chicago, and it was duly mailed to Ira J. Mason & Son. On the same day Mason wrote Sanford as follows:

"If you wish to revive policy No. 26071, which lapsed thirty days since for non-payment of premium, please sign and return enclosed form No. 22, with premium, $128.48, within thirty days."

These letters passed each other in the mail, the latter being received and opened by Frank Sanford on Monday, March 12th. In the letter Mason enclosed a blank, known as form No. 22, which recited that policy No. 26071 had lapsed for non-payment of premium due February 10th, and that the signer, for the purpose of obtaining its revival, certified that Sanford was still in good health and that there was nothing in his condition likely to impair his health or shorten his life, and that it was thereby agreed that if this representation proved in any respect untrue, the policy should be treated as if it had not been revived. On March 12th, Mason & Son wrote Sanford as follows, enclosing another form No. 22:

"We are in receipt of your favor of the 10th with remittance of $130. We find that we sent you your note, form No. 71, for signature, to extend the insurance under your

policies, but we think you failed to send it in—at any rate we never received it. Please now sign the enclosed form No. 22 and return it."

Again on March 17th Mason wrote Sanford as follows, enclosing still another form 22:

"If you have not already sent in form No. 22, for which we wrote you recently, kindly sign and send in the enclosed form that we may accept your check and send you the company's renewal receipt."

On March 22d W. G. Sanford wrote Mason & Son of his father's death, and they replied as follows on March 23d:

"We are very sorry to hear of the death of your father announced in your letter of the 22d, and in the funeral notice. We have to-day written the company and will advise you further in a few days in regard to his insurance."

On April 3d Mason & Son wrote W. G. Sanford as follows:

"We are in receipt of yours of the 30th ult., enclosing proofs in the case of claim under policies Nos. 3330, 113514 and 26071 on the life of the late E. Sanford. We forward them to the company to-day and hope to advise you further in about a week."

Meantime on March 28th they wrote him as follows, returning the check:

"Enclosed we return check for $130 which was sent us after policy No. 26071 on the life of your father, E. Sanford, lapsed. We held this check that you might send us form No. 22, which we waited for but did not receive. The company wishes us to write you that it will recognize this policy as good for $2,680, the amount of the paid-up policy which would have been issued had it been applied for. Enclosed you will find proofs of loss to be executed and returned to us."

E. L. Clover and Wood & Oakley, attorneys for appellant.

Samuel Richolson, attorney for appellee.

Mr. Justice Dibell delivered the opinion of the court.

The letter written by Frank Sanford to the company on

February 5th, was dated at Morris, Illinois, and on his father's letter head. It informed the company his father was in Mexico and could not be reached and a reply returned in time to act by February 10th. It showed that the writer desired to be informed whether it was necessary the premium falling due February 10th should be paid on that date or if it could wait until Sanford returned and then be paid, and what the rules of the company on that subject were. It indicated that the writer desired and intended to do whatever was necessary, but wished to leave till his father's return whatever could be so left without infringing the company's rules. It is not necessary to decide whether Mason & Son were bound to answer this letter. They did answer it, and they were bound to convey true information and not in any way to mislead Frank or to withhold some part of the necessary information. He had a right to rely upon their letter. In their reply Mason & Son enclosed a note for an extension of the premium for sixty days, and suggested that Frank sign it for his father, "and in the meantime you can communicate with him and learn what his wishes are." This letter was written February 8th, and liable to be received, as it was, on February 9th. These agents did not tell Frank that unless the note was signed and returned to them, or the cash paid, by the 10th, the policy would become forfeited. Frank's letter to them showed them that he was ignorant of the rules governing that subject, and applied to them for information.

He would naturally understand they were making a full answer to his letter, or as full an answer as was necessary for his correct guidance. If they had said to him, the cash or this note duly signed must reach them February 10th or the policy would be forfeited, it is a fair inference he would have done what was necessary to keep the policy alive. They told him only to sign the note for his father, and then during the sixty days thus provided, communicate with his father and ascertain whether or not he wished to pay the premium and keep the policy alive. The letter told Frank his father would have sixty days in which to make that

determination. Mason & Son dated the note February 10th. It can not be assumed they intended Frank should sign it before that date. He did sign it on that date, and caused it to be mailed in time to reach the agents during business hours of the next business day. The letter left it uncertain whether Mason & Son desired Frank to sign his father's name to the note or his own. It was natural that he should doubt whether he had a right to sign his father's name, and should wish to consult his older brother on the subject before acting. While Mason & Son probably meant that he should send the note to them before communicating with his father, their letter did not say so, and was uncertain in that respect. Their letter clearly implied that the note was not to be paid if his father desired to let the insurance lapse, and left it uncertain whether he was expected to send in the note before his father had ratified his act in signing it. Mason testified he knew Sanford's financial circumstances were good, and he no doubt felt entirely sure that when Sanford returned or was reached he would not allow a policy to lapse upon which he had paid premiums for twenty-three years, aggregating over $3,000.

It is within the power of an insurance company to waive such a provision as that here relied upon, and this may be by its course of dealing with the insured. (Chicago Life Ins. Co. v. Warner, 80 Ill. 410.) In Metropolitan Accident Ass'n v. Windover, 137 Ill. 417, the court said:

"It can not be doubted that while, by the express terms of the defendant's by-laws, the consequences of a failure to pay an assessment within thirty days after notice was a forfeiture of all claims the member might have against the defendant by reason of his certificate, the forfeiture thus provided for was one which the defendant was at liberty to waive, and that such forfeiture, after being once waived, was incapable of assertion by the defendant. A forfeiture of this character is a matter of strict legal right, and the defendant, in order to assert it, must abide inflexibly by the terms of its contract. (Johnson v. Southern Life Ins. Co., 79 Ky. 403.) It follows that conduct on the part of the association inconsistent with an intention to abide by the strict terms of the contract and insist upon a forfeiture, if not amounting to a waiver, is at least evidence of a waiver."

We are of opinion that by what was said by Mason & Son in their letter of February 8th, and by their omission to state therein that forfeiture would follow a failure to pay or send the note by February 10th, they granted an extension of sixty days and waived their right to forfeit the policy. After a reasonable time in which to ascertain whether the letter meant he should sign his own name for his father or should sign his father's name, he did both, and mailed the letter to the agents so that it should reach them during the next business day. We regard it as immaterial whether the note in fact reached the office of Mason & Son or miscarried in the mails. The agents did not intend the note should be enforcible if Sanford did not ratify it. The signing of Sanford's name to the note without his authority was a mere matter of form. The substantial matter was that the time should be extended sixty days, so that Sanford might be notified and his wishes ascertained and carried out. The purpose obviously was that Sanford should be notified his name had been signed to a note for the premium without his authority, and that he could either ratify the act and pay the note within sixty days or could repudiate it and let the policy lapse and take a paid-up policy for the surrender value if he preferred. Having granted an extension of sixty days the company could not, a month later, demand the execution of form 22, which required Sanford to admit thereby that the policy had already lapsed, and to certify that he was still in good health, as a condition to permitting the policy to remain in force during the sixty days.

On March 10th Sanford remitted Mason a check for $130, thanking him for the extension of payment for sixty days, and saying he did not know the exact amount required and presumed there would be some interest to be added, and requesting if the remittance was not sufficient to inform him immediately and he would remit, and saying if it was too much they could credit the balance due on the policy or return the surplus to him, as they saw fit. This was a ratification of the note and of the extension and an election to treat that policy as still in force. In reply to this Mason

& Son did not deny his statement that they had extended the policy for sixty days, but called upon him again for the execution of form 22, to which we are of opinion they were not entitled. They did not object to payment by check, nor did they present the check to the Chicago bank on which it was drawn for payment. They retained the check not only till Sanford's death on March 18th, but for ten days thereafter, and finally returned it on March 28th, eighteen days after it was sent. We are of opinion Sanford had the right to pay the required amount at the time he sent the check, and, as the check was sufficient to cover the amount due, their retention of it beyond a reasonable time for its return or its presentation for payment precluded them from afterward asserting a forfeiture. By the check Sanford assigned $130 of his funds in said bank to the company to pay said premium and interest thereon, and the company's agents retained the benefit of that assignment for eighteen days. It is a fair inference they would have cashed the check if Sanford had recovered. The retention of the check is strong proof that they had not decided to enforce a forfeiture even for some days after Sanford's death.

If there was any inaccuracy in the court's modification of the seventh instruction offered by defendant so as to state it was a sufficient delivery of the note if it was delivered by the maker to some person for transmission to the payee, we regard it as immaterial and harmless. The note having been signed as directed by defendant's agents, and an attempt having been made to deliver it to them, the policy would not be avoided by failure to make a legal or sufficient delivery, in view of the fact that the agents did not instruct Frank to send the note to them, but left it an open question whether they did not intend he should retain it till his father ratified it. We find no reversible error in the rulings of the court. The proofs made a case for plaintiff.

The judgment is therefore affirmed.